UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CRAIG WIGGINS, REBECCA TORRES,
and CHARITA HARRELL, on behalf of
himself and all others similarly situated,

                     Plaintiff,

        - against -

UNILEVER UNITED STATES, INC., dba
DOVE,

                     Defendant.

**ORDER**

21 Civ. 1964 (PGG)

---

PAUL G. GARDEPHE, U.S.D.J.:

In this putative class action brought pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), Plaintiffs Craig Wiggins, Rebecca Torres, and Charita Harrell allege claims against Defendant Unilever United States, Inc., for violations of Sections 349 and 350 of the New York General Business Law ("GBL"), violations of similar provisions in California and Pennsylvania law, and breach of warranty and unjust enrichment under New York, Pennsylvania, and California law. (Am. Cmplt. (Dkt. No. 28) ¶¶ 171-255; see also Cmplt. (Dkt. No. 1))

On November 3, 2021, Defendant Unilever moved to dismiss the Amended Complaint. (Def. Mot. (Dkt. No. 31)) On July 26, 2023, this Court granted Defendant's motion to dismiss with leave to amend. (Dismissal Order (Dkt. No. 39) at 39)

On August 29, 2023, Plaintiff Wiggins – proceeding without co-plaintiffs Torres and Harrell – moved for leave to file a Second Amended Complaint. (Mot. to Amend (Dkt. No. 43)) In the proposed Second Amended Complaint ("SAC"), Plaintiff Wiggins ("Plaintiff") re-

pleads claims under GBL §§ 349 and 350 and for breach of warranty under New York law.  (See SAC (Dkt. No. 43-1))

For the reasons stated below, Plaintiff's motion for leave to file the proposed Second Amended Complaint will be denied.

**BACKGROUND**

I.    **FACTS**[1]

Defendant Unilever manufactures, markets, and sells cosmetic products under the "Dove" brand name.  (SAC (Dkt. No. 43-1) ¶ 32)  Unilever's Dove products are sold throughout the United States (id.), and Unilever "prominently labels many of its [Dove] products as 'hypoallergenic.'"  (Id. ¶ 5)

Plaintiff alleges that "[f]or approximately thirty-six months, [he] regularly purchased Dove[] Nourishing Body Wash and Dove[] Men+Care Body and Face Wash Sensitive Shield from the Rite Aid located at 840 Westchester Ave., Bronx, NY, 10459 . . . every four to six weeks until the fall and/or winter of 2020."  (Id. ¶¶ 19, 21)  Wiggins alleges that because he

---

[1]  The Court's factual statement is drawn from the proposed Second Amended Complaint.  All well-pled facts in the SAC are presumed true for purposes of resolving Plaintiff's motion to amend.  See Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc., No. 08 Civ. 1533 (BSJ) (JCF), 2011 WL 1142916, at *4 (S.D.N.Y. Mar. 22, 2011); see also Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).  "Because determinations of futility on a motion for leave to amend are subject to the same standards as motions under Rule 12(b)(6), '[f]utility is generally adjudicated without resort to any . . . evidence [outside the face of the complaint].'"  Gary Friedrich Enterprises, LLC, 2011 WL 1142916, at *4 (quoting Wingate v. Gives, 05 Civ. 1872 (LAK) (DF), 2009 WL 424359, at *5 (S.D.N.Y. Feb. 13, 2009)).  The Court may properly consider documents attached to the complaint as exhibits, incorporated by reference, or integral to the Complaint, however.  See, e.g., Max Impact, LLC v. Sherwood Grp., Inc., 09 Civ. 902 (LMM) (HBP), 2012 WL 3831535, at *4 (S.D.N.Y. Aug. 16, 2012) ("[I]n making futility determinations, the court must limit itself to the allegations in the complaint, as well as to any documents attached to the complaint as exhibits or incorporated by reference." (citations omitted)); see also Bldg. Indus. Elec. Contractors Ass'n v. City of N.Y., 678 F.3d 184, 187 (2d Cir. 2012).

"has suffered skin irritation, eye irritation, dermatitis, and/or an allergic skin reaction in the past" (id. ¶ 23), he seeks out products labelled as "hypoallergenic" to "avoid developing a skin allergy" and to "avoid the inflammatory cascade caused by an unidentified skin allergen." (Id. ¶ 3)  In deciding to purchase Defendant's Dove products, Wiggins "saw, relied upon, and reasonably believed the label representation that the products [he purchased] were 'hypoallergenic.'" (Id. ¶ 20)

According to the SAC, "[r]easonable consumers believe and expect that a hypoallergenic product does not contain skin allergens in an amount that is known to cause an allergic reaction in a significant number of people." (Id. ¶ 53)  "Reasonable consumers also believe and expect that a hypoallergenic product does not contain a significant amount of ingredients known to produce skin irritation or corrosion."  (Id. ¶ 57)

According to Plaintiff, Unilever's Dove products are not actually hypoallergenic because they all contain "skin allergens . . . in an amount known to cause allergic reactions in a significant number of people."  (Id. ¶ 62)

Newly added in the proposed SAC are specific allegations regarding four chemicals that Plaintiff asserts are found in Unilever's Dove products and that allegedly "cause skin irritation or skin damage":  methylisothiazolinone ("MI"), cocamidopropyl betaine ("CAPB"), DMDM hydantoin, and niacinamide.  (Id. ¶¶ 49, 65-109)  Dove Men+Care Body and Face Wash Sensitive Shield contains MI and DMDM hydantoin, and Dove Nourishing Body Wash contains CAPB.  (Id. ¶ 49)  Niacinamide is not an ingredient in either Dove product that Plaintiff purchased regularly.  (Id.)

According to Plaintiff, "Dove uses MI in its products as a preservative to counteract bacteria, yeast, and mold."  (Id. ¶ 71 (citing SAC, Ex. 12 (Dkt. No. 43-18))  Plaintiff

further alleges that in order for MI to function as intended in Dove products, it must be used at a concentration of between 166-1000 ppm.  (Id. ¶ 73 (citing SAC, Ex. 13 (Dkt. No. 43-19) at 6)) Plaintiff asserts that even "100 ppm MI in cosmetic products is not safe for the consumer."  (Id. ¶ 68 (citing SAC, Ex. 11 (Dkt. No. 43-17) at 31-32))  And "because Dove includes MI in its products as a preservative, the minimum possible concentration Dove uses is greater than 100 ppm."  (Id. ¶ 74)  Plaintiff also alleges that "Unilever admit[ted] that [MI's] inclusion in its products causes a risk of allergic reaction."  (Id. ¶ 77; id., Ex. 12 (Dkt. No. 43-18) at 3 ("after dermatologists expressed concern that MI can trigger skin allergies in increasing numbers of people, our Safety and Environmental Assurance Centre (SEAC) reviewed all relevant clinical data.  As a result, we are phasing it out from our leave-on personal care products and reducing levels in rinse-off personal care products."))

The SAC newly alleges that CAPB causes an allergic response at a 1% concentration (Id. ¶¶ 79-84), and that "the following Dove products contain CAPB at a concentration of at least 1-5%:  Dry Skin Relief Gentle Cleansing Body Wash, Beauty Bars, and Shampoo Rich Moisture.  Its Instant Foaming Body Wash Sensitive Skin contains CAPB at a concentration of 3-5%."  (Id. ¶ 85 (emphasis in original) (citing id., Ex. 2 (Dkt. No. 43-8)) Extrapolating from known data safety sheets and order of ingredient lists, Plaintiff concludes that "all [of Defendant]'s bars, washes, and shampoos have 1-5% CAPB, as evinced by [Defendant]'s safety data sheet, or their similarity to a product whose safety data sheet demonstrates [that it] has 1-5% CAPB."  (Id. ¶ 91)

The SAC also newly alleges that Dove Men+Care Body and Face Wash Sensitive Shield contains DMDM Hydantoin "as a preservative to protect the product from bacteria, yeast, and mold."  (Id. ¶ 101 (citing SAC, Ex. 24 (Dkt. No. 43-30) at 7))  Plaintiff alleges that there is

"reputable testing showing allergic responses to a 0.1% concentration of DMDM hydantoin in humans." (Id. ¶ 98 (citing SAC, Ex. 21 (Dkt. No. 43-27))  According to the SAC, "for DMDM hydantoin to perform its preservative function, it must be used at a concentration of at least 0.15%." (Id. ¶ 102 (citing SAC, Exs. 25, 26 (Dkt. Nos. 43-31, 43-32))  Plaintiff concludes that because Unilever "includes DMDM hydantoin in its product as a preservative, the minimum possible concentration Dove uses is greater than 0.15%." (Id. ¶ 103)

Finally, the SAC newly alleges that "niacinamide has been found to cause an allergic response to a significant portion of the population even in extremely small amounts, e.g., ≤ 0.1% intradermal induction dose causing a positive response in more than 30% of guinea pigs in a guinea pig maximization test." (Id. ¶ 106 (citing SAC, Exs. 20, 27 (Dkt. Nos. 43-26, 43-33)) "In personal care products, niacinamide is typically used in concentrations ten to sixty times this, or 1-6%." (Id. ¶ 107 (citing SAC, Ex. 28 (Dkt. No. 43-34))  Plaintiff notes that "[t]he precise niacinamide concentration used in Dove is protected as a trade secret," but "nothing indicates that Dove uses an atypical concentration." (Id. ¶ 108)  "[B]ecause a niacinamide concentration of 0.1% causes an allergic response in a significant number of persons, . . . Dove's products would likewise cause an allergic response in a significant number of persons." (Id. ¶ 109)  As noted above, Plaintiff Wiggins does not regularly purchase Dove products containing niacinamide. (Id. ¶ 49)

In the SAC, Plaintiff Wiggins asserts that had he "known at the time of his purchases that [the Dove] products were not hypoallergenic as promised, he would not have purchased these products." (Id. ¶ 26)  Plaintiff further alleges that he (1) "purchased, purchased more of, or paid more for, these products than he would have had he known that the products were not hypoallergenic, as promised"; (2) "paid a price premium for the false 'hypoallergenic'

promise"; and (3) was "deprived of the benefit of the bargain because the [Dove] [p]roducts [he] purchased were different from what [Defendant] warranted" or "had less value than what [Defendant] represented." (Id. ¶¶ 29, 159-160, 162, 164)

The SAC also newly alleges that "[t]here are relatively few brands that sell hypoallergenic products for Plaintiff Wiggins to choose from," and that "Dove, which frequently markets itself as 'hypoallergenic,' commands much of the shelf space" in stores. (Id. ¶ 123) "Whether Dove's product is or is not hypoallergenic" can only be ascertained by the concentration of the ingredients in the product, however, which Defendant does not disclose. (Id. ¶¶ 117-118) Because of these circumstances, and because Defendant regularly reformulates its Dove products, "Plaintiff Wiggins cannot tell if Dove[] products were reformulated to no longer be hypoallergenic. Similarly, he cannot tell if Dove[] products were reformulated to become hypoallergenic." (Id. ¶ 124) Wiggins and other consumers thus suffer "recurring confusion" about whether Dove products contain allergens. (Id. ¶¶ 117-124)

Finally, the SAC newly alleges that on August 18, 2021 – within eight months of purportedly discovering that Defendant's Dove products are not hypoallergenic – "Plaintiff [Wiggins] provided Dove and the retailers from which he purchased the . . . [Dove] [p]roducts notice of the breach of warranty by certified mail." (Id. ¶ 22)

## II.    PROCEDURAL HISTORY

### A.    The July 26, 2023 Dismissal Order

The Complaint was filed on March 5, 2021 (Cmplt. (Dkt. No. 1)), and the Amended Complaint was filed on August 18, 2021. (Am. Cmplt. (Dkt. No. 28)). On November 3, 2021, Unilever moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(l), (b)(2), and (b)(6). (Def. Mot. (Dkt. No. 31)) Unilever argued, inter alia, that Plaintiffs lack standing; that this Court lacks personal jurisdiction over Unilever as to the claims of Plaintiffs

Torres and Harrell; and that the Amended Complaint fails to state a claim.  (Def. Br. (Dkt. No. 32))

On July 26, 2023, this Court granted Defendant's motion to dismiss.[2]  (Dismissal Order (Dkt. No. 39))  As to standing, this Court concluded that Plaintiffs Wiggins, Torres, and Harrell had alleged an economic injury giving them standing to seek monetary relief.  Because they had not demonstrated any likelihood of future harm, however, they lacked standing to seek injunctive relief.  (Id. at 14, 17)

This Court dismissed Plaintiff Torres and Plaintiff Harrell's claims, finding that they were out-of-state plaintiffs who had not alleged sufficient contacts between Unilever and New York arising out of or relating to their claims.  (Id. at 18-22)

As to Plaintiff Wiggin's GBL claim, this Court noted that "while in their briefing Plaintiffs assert that 'their claims focus on the products' formulation, alleging that the formulation causes allergic reactions,'" "the Amended Complaint's factual allegations only assert that the Dove products 'contain substances classified by reputable authorities as skin sensitizers' or eye irritants."  (Id. at 30 (quoting Pltf. Opp. (Dkt. No. 36) at 19, 21))  As such, Plaintiffs had not sufficiently "pl[ed] factual allegations demonstrating that the chemicals they cite actually cause allergic reactions and eye irritation such that Defendant's hypoallergenic' and 'tear-free' labels are false and misleading."  (Id.)  Having concluded that the Amended Complaint did not adequately plead that the Dove labelling was misleading, this Court did not reach the issue of whether Plaintiffs had adequately alleged injury under the GBL.

---

[2]  Familiarity with the July 26, 2023 Dismissal Order is assumed.  See Wiggins v. Unilever United States, Inc., 21 Civ. 1964 (PGG), 2023 WL 7005147 (S.D.N.Y. July 26, 2023); Dkt. No. 39.

As to Plaintiff Wiggins' breach of warranty claim, the Court noted that "the Amended Complaint does not disclose when Wiggins purchased the Dove products at issue, or when he discovered the alleged defect in these products.  Accordingly, Wiggins has not demonstrated that he gave notice within a reasonable time after he 'discovered the alleged breach of warranty.'"  (Id. at 35 (quoting Tyman v. Pfizer, Inc., 2017 WL 6988936, at *23 (S.D.N.Y. Dec. 27, 2017), report and recommendation adopted, 2018 WL 481890 (S.D.N.Y. Jan. 18, 2018))  The Court therefore dismissed Wiggins' breach of warranty claim.

Finally, the Court dismissed Plaintiff Wiggins' claim for unjust enrichment as duplicative of his other claims.  (Id. at 37-38)

Despite prior amendment, the Court granted Plaintiffs leave to move to amend, "because this Court [could not] find that no amendment could succeed."  (Id. at 39)  In granting leave, the Court warned that

> [a]ny proposed Second Amended Complaint "will have to do some combination of the following:  substantiate Plaintiffs' claims that the in-use concentration of the potentially harmful ingredients in the [Dove] [p]roducts are sufficient to cause harm, demonstrate that the [Dove] [p]roducts have actually caused some of the harms Plaintiffs say they can cause, and/or significantly strengthen Plaintiffs' allegations that the information necessary to state a claim is exclusively in Defendant's control."

(Id. (quoting Rivera v. S.C. Johnson & Son, Inc., 2021 WL 4392300, at *7 (S.D.N.Y. Sept. 24, 2021))

### B.    **The Proposed Second Amended Complaint**

On August 29, 2023, Plaintiff Wiggins moved for leave to file a Second Amended Complaint.  (Mot. to Amend (Dkt. No. 43))[3]

---

[3]  The proposed SAC is attached as an exhibit to Plaintiff Wiggins' motion.  (SAC (Dkt. No. 43-1))

In the proposed SAC, Plaintiff alleges violations of Sections 349 and 350 of the GBL and breach of warranty under New York law.  (See SAC (Dkt. No. 43-1))  In support of these claims, and as discussed above, the SAC pleads new factual allegations.

In an effort to provide a basis for injunctive relief, Plaintiff adds new factual allegations stating that he and other consumers suffer "recurring confusion" as a result of Defendant's failure to "disclose the concentration of its ingredients" and whether its products have been reformulated.  (Id. ¶¶ 123-24)

In an effort to bolster his GBL claims, Plaintiff pleads new and more specific allegations regarding the ingredients in Dove's products.  In the Amended Complaint, Plaintiffs alleged that "Dove's Falsely Labeled Products contain one or more of the following chemicals that are recognized by governmental authorities as skin sensitizers (a.k.a. skin allergens) or by the American Contact Dermatitis Society ("ACDS") as a core allergen," and then listed fourteen chemicals.  (Am. Cmplt. (Dkt. No. 28) ¶ 102)  In dismissing the Amended Complaint, this Court found that Plaintiffs' allegations were "conclusory" and did not "demonstrate[e] that the chemicals . . . cite[d] actually cause allergic reactions . . . such that Defendant's 'hypoallergenic' . . . labels are false and misleading."  (Dismissal Order (Dkt. No. 39) at 30)

In the SAC, Plaintiff adds new allegations to support his claim that the "Dove[] Falsely Labeled Products are not hypoallergenic, and [that Defendant's] on-the-label promise that its products are 'hypoallergenic' is false."  (SAC (Dkt. No. 43-1) ¶ 63)  As discussed above, in his new allegations, Plaintiff focuses on four chemicals allegedly found in Dove products: methylisothiazolinone, cocamidopropyl betaine, DMDM Hydantoin, and niacinamide.  (SAC (Dkt. No. 43-1) ¶¶ 65-109)  In the SAC, Plaintiff Wiggins also cites scientific studies as well as comparisons to similar products to allege the concentrations of these four chemicals in specific

Dove products. (<u>See</u> <u>id.</u> ¶ 78 ("Dove[] Men+Care Body and Face Wash Sensitive Shield is not hypoallergenic, as it contains a skin allergen (MI) in an amount (more than 100 ppm) that is known to cause an allergic reaction in a significant number of people."); <u>id.</u> ¶ 93 (Dove products "all contain 1% or more of CAPB, which is a concentration that is known to cause an allergic reaction to a significant number of people."); <u>id.</u> ¶ 104 (Dove products "contain[] a minimum of 0.15% DMDM hydantoin, which is more than the amount known to cause an allergic response in a significant number of persons."); <u>id.</u> ¶ 109 ("[B]ecause a niacinamide concentration of 0.1% causes an allergic response in a significant number of persons . . . , Dove[] products would likewise cause an allergic response in a significant number of persons."))

Finally, in the SAC, Plaintiff adds new allegations stating that on August 18, 2021 – within eight months of discovering that Defendant's Dove products are not hypoallergenic – "Plaintiff [Wiggins] provided Dove and the retailers from which he purchased the . . . [Dove] [p]roducts notice of the breach of warranty by certified mail." (<u>Id.</u> ¶ 22)

## DISCUSSION

## I.    LEGAL STANDARDS

Under the Federal Rules of Civil Procedure, leave to amend should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). District courts "ha[ve] broad discretion in determining whether to grant leave to amend." <u>Gurary v. Winehouse</u>, 235 F.3d 792, 801 (2d Cir. 2000).

A court may properly deny leave to amend in cases of "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" <u>Ruotolo v. City of New York</u>, 514 F.3d 184, 191 (2d Cir. 2008) (quoting <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)); <u>see also</u> <u>Murdaugh v. City of</u>

New York, 10 Civ. 7218 (HB), 2011 WL 1991450, at *2 (S.D.N.Y. May 19, 2011) ("Although under Rule 15(a) of the Federal Rules of Civil Procedure leave to amend complaints should be 'freely given,' leave to amend need not be granted where the proposed amendment is futile." (citations omitted)).

An amendment is futile where it is legally insufficient on its face such that the amended claim could not survive a motion to dismiss.  Lucente v. IBM Corp., 310 F.3d 243, 258 (2d Cir. 2002).  Accordingly, a motion to amend "requires an examination of the proposed amendments through the prism that would apply to a Rule 12(b)(6) motion."  BLT Rest. Grp. LLC v. Tourondel, 855 F. Supp. 2d 4, 14 (S.D.N.Y. 2012) (citing Nettis v. Levitt, 241 F.3d 186, 194 n.4 (2d Cir. 2001) overruled on other grounds, Slayton v. Am. Exp. Co., 460 F.3d 215 (2d Cir. 2006)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The complaint's factual allegations must be "sufficient 'to raise a right to relief above the speculative level.'"  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Twombly, 550 U.S. at 555).  "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint[,]" Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and

does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).

## II.    STANDING TO SEEK INJUNCTIVE RELIEF

In the proposed SAC, Plaintiff renews his request for injunctive relief, stating that he "seeks an order . . . enjoining Dove from continuing to engage in unlawful, unfair, or fraudulent business practices or any other act prohibited by law."  (SAC (Dkt. No. 43-1) ¶ 192; see id. ¶ 202; id. at 42)

In asserting that Plaintiff's claim for injunctive relief fails, Defendant argues that "Plaintiff does not have standing to pursue injunctive relief because there is no likelihood that he will suffer any future harm."  (Def. Br. (Dkt. No. 45) at 6)

### A.    Applicable Law

"The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance.  This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limits on its exercise." United States v. Suarez, 791 F.3d 363, 366 (2d Cir. 2015) (internal quotation marks and citation omitted).  To establish constitutional standing, a plaintiff must show that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  The plaintiff bears the burden of establishing the elements of standing, Spokeo, 578 U.S. at 338 (citation omitted), and "at the pleading stage[] the plaintiff must 'clearly . . . allege facts demonstrating' each element." Id. (quoting Warth v. Seldin, 422 U.S. 490, 518 (1975)).

The requisite "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized[;] . . . and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotation marks and citations omitted). A plaintiff must "demonstrate standing separately for each form of relief sought," TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2210 (2021) (citing Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 185 (2000)), and a plaintiff "seeking injunctive relief must also prove that the identified injury in fact presents a real and immediate threat of repeated injury." Kreisler v. Second Ave. Diner Corp., 731 F.3d 184, 187 (2d Cir. 2013). "Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 239 (2d Cir. 2016). Finally, "[a] plaintiff seeking to represent a class must personally have standing." Id. (citing Lewis v. Casey, 518 U.S. 343, 357 (1996)).

**B.**     **Analysis**

The proposed SAC does not contain new factual allegations that cure the standing defects identified in the Dismissal Order. In the Dismissal Order, this Court explained that

> Plaintiffs whose claims are premised on a product's false or misleading labelling can generally not credibly plead a threat of future harm because they "'will not again be under the illusion' that caused their initial harm." Quintanilla v. WW Int'l, Inc., 541 F. Supp. 3d 331, 341 (S.D.N.Y. 2021) (quoting Berni v. Barilla S.p.A., 964 F.3d 141, 147 (2d Cir. 2020). "'[I]nstead, next time they buy [the product], they will be doing so with exactly the level of information that they claim they were owed from the beginning.'" Id. (quoting Berni, 964 F.3d at 148). "Thus, courts have held, following Berni, that past purchasers generally lack standing to seek an injunction because it is unlikely that they, or any class they seek to represent, will suffer the same harm again." Id. at 341 (citing Campbell v. Whole Foods Mkt. Grp., 516 F. Supp. 3d 370, 395 (S.D.N.Y. 2021)) ("If [plaintiff] does purchase the product again in the future, she will not be harmed in a similar way, because any future purchase will be made with knowledge of the product's ingredients, and because she will only purchase the product if the

allegedly misleading representations of which she complains are fixed. Therefore, Plaintiff lacks standing.").

Under <u>Berni</u>, Plaintiffs lack standing to assert claims for injunctive relief. While Plaintiffs allege that they purchased Unilever's Dove products in reliance on representations that the Dove products are hypoallergenic and tear-free (<u>see</u> Am. Cmplt. (Dkt. No. 28) ¶¶ 141-49), Plaintiffs maintain that they have since learned that those products contain allergens and eye irritants, and thus do not meet the reasonable consumer's definition of "hypoallergenic." (<u>Id.</u> ¶¶ 92-115) It follows from these allegations that if Plaintiffs purchase the Dove products at issue in the future, they "'will not [ ] be under the illusion' that caused their initial harm [and will] 'instead[ ] . . . be doing so with exactly the level of information that they claim they were owed from the beginning.'" <u>Quintanilla</u>, 541 F. Supp. 3d at 341 (quoting <u>Berni</u>, 964 F.3d at 147).

Moreover, the Amended Complaint's allegations that if Unilever's Dove "products were reformulated such that its representations were truthful, [Plaintiffs] would consider purchasing Dove's products in the future" (Am. Cmplt. (Dkt. No. 28) ¶¶ 30, 44, 58), are not sufficient to establish standing. Such hypothetical future purchases do not demonstrate the "real or immediate threat" of injury necessary to pursue injunctive relief. <u>Nicosia</u>, 834 F.3d at 239; <u>see also</u> <u>Gordon v. Target Corp.</u>, 2022 WL 836773, at *8 (S.D.N.Y. Mar. 18, 2022) ("[Plaintiff's] allegation that she 'intends to, seeks to, and will purchase the product again when she can do so with the assurance that the [p]roduct's representations about its components and ingredients are consistent with its representations,' fails to demonstrate that she is likely to suffer future harm."); <u>Patellos</u>, 523 F. Supp. 3d at 538 ("[A] plaintiff who merely alleges that she 'would purchase a product if re-engineered or re-marketed does not show a real or immediate threat of future injury.' ") (quoting <u>Duran v. Henkel of Am., Inc.</u>, 450 F. Supp. 3d 337, 356 (S.D.N.Y. 2020)).

(Dismissal Order (Dkt. No. 39) at 15-17)

In again seeking injunctive relief in the SAC (SAC (Dkt. No. 43-1) at 42), Plaintiff argues that he "remains under a real threat of once again purchasing a Dove product misleadingly labeled as hypoallergenic." (Pltf. Br. (Dkt. No. 44) at 8-9) Plaintiff argues that due to limited offerings of hypoallergenic products, he may have to purchase Dove products again, and he "will not know if the product is truly hypoallergenic in the future." (<u>Id.</u> at 9-11)

In making this argument, Plaintiff relies on <u>Hyland v. Navient Corp.</u>, 48 F.4th 110

(2d Cir. 2022).  In <u>Hyland</u>, the Second Circuit considered a putative class of student loan

borrowers who were suing a student loan servicing company:

> In 2007 the federal government created the Public Service Loan Forgiveness
> program ("PSLF") to help address the problem of overwhelming student
> debt.  <u>See</u> College Cost Reduction and Access Act, Pub. L. No. 110–84, § 401,
> 121 Stat. 784, 800 (2007).  Under PSLF, teachers, social workers, police officers,
> and others working in public service may have their federal student debt forgiven
> after 120 qualifying payments.  To administer the program, the federal
> Department of Education contracts with for-profit "servicing companies,"
> including Navient, which alone services more than $205.9 billion in federal
> student loans.
>
> Navient aims to help borrowers "understand the complex array of federal loan
> repayment options so they can make informed choices about the plans that are
> aligned with their financial circumstances and goals."  App'x 35.  In October
> 2018, however, a group of public servants who had contacted Navient for help
> repaying their loans (collectively, "Plaintiffs") filed a putative class action lawsuit
> in the Southern District of New York, alleging that Navient had not "liv[ed] up to
> its obligation to help vulnerable borrowers get on the best possible repayment
> plan and qualify for PSLF."  App'x 36.  They claimed that Navient had
> "[d]eceived borrowers by [erroneously] informing them PSLF was not available
> to them," "[m]isled borrowers by stating they were 'on track' for PSLF when in
> fact their repayment plan did not qualify for PSLF," and "[a]dvised borrowers not
> to submit paperwork that would verify their employment and other qualifying
> factors for PSLF."  App'x 37.  As a result, according to the Plaintiffs' amended
> complaint, borrowers were "denied loan forgiveness at alarming rates, with
> horrifying effects on the borrowers and their families and communities."  App'x
> 37.

<u>Hyland</u>, 48 F.4th at 114-15.

Defendants argued that because "[s]ome class members were no longer using

Navient to service their loans when the class was certified[,] . . . the class as a whole . . . lacked

standing to pursue injunctive relief."  <u>Id.</u> at 117.

The Second Circuit nonetheless found that the entire <u>Hyland</u> class had standing,

because "[a]t least six of the named plaintiffs continue[d] to have a relationship with Navient,"

which meant that they were "likely to suffer future harm because they continued to rely on Navient for information about repaying their student loans." Id. at 118.

Here, Plaintiff Wiggins argues that, "[j]ust as the plaintiffs' knowledge that loan forgiveness was available did not defeat standing in Hyland, Plaintiff's knowledge [of Defendant's misrepresentations regarding Dove products] does not defeat standing." (Pltf. Br. (Dkt. No. 44) at 9)

Plaintiff misapprehends Hyland's holding. The decision in Hyland turned on the fact that six of the named plaintiffs were still Navient customers, and had shown a likelihood of future harm. See Hyland, 48 F.4th at 118. Here, by contrast, Plaintiff is not in a continuing relationship with Unilever. He is free to purchase Dove products – with full knowledge of Defendant's past alleged use of allergens – or to purchase the products of another company.

And for reasons explained in the Dismissal Order, Plaintiff Wiggins' suggestion that he might purchase a reformulated Dove product in the future (SAC (Dkt. No. 43-1) ¶¶ 117-124) does not provide a basis for this Court to grant injunctive relief. "[A] plaintiff who merely alleges that she 'would purchase a product if re-engineered or re-marketed does not show a real or immediate threat of future injury.'" Patellos v. Hello Prod., LLC, 523 F. Supp. 3d 523, 538 (S.D.N.Y. 2021) (quoting Duran v. Henkel of Am., Inc., 450 F. Supp. 3d 337, 356 (S.D.N.Y. 2020)); see also Atik v. Welch Foods, Inc., 15 Civ. 5405 (MKB) (VMS), 2016 WL 5678474, at *6 (E.D.N.Y. Sept. 30, 2016) ("Plaintiffs also allege that they would resume purchasing the Products in the future but only if the representations on the Products' labels were 'truthful and non-deceptive.' . . . These allegations are insufficient to establish a likelihood of future injury because Plaintiffs cannot rely on past injury.").

And while Plaintiff alleges that he "regularly searches for personal care products that will not cause him negative skin reactions," and that "[t]here are relatively few brands that sell hypoallergenic products" (SAC (Dkt. No. 43-1) ¶¶ 122-123), these allegations are not sufficient to confer standing to seek injunctive relief.  Even if the case law did not foreclose Plaintiff's argument, it is not plausible – given Plaintiff's allegations concerning Dove products – that he would purchase Dove products again.  As the Second Circuit has explained, "past purchasers of a product . . . are not likely to encounter future harm of the kind that makes injunctive relief appropriate," because they "are not bound to purchase a product again – meaning that once they become aware they have been deceived, that will often be the last time they will buy that item."  Berni, 964 F.3d at 147.

Even accepting the SAC's allegation that Dove products "command[] much of the shelf space" (SAC (Dkt. No. 43-1) ¶ 123), Plaintiff does not contend that Dove products are the only hypoallergenic products on the market.  Given that Plaintiff is free to purchase products that he believes are truly hypoallergenic, it is not plausible – in light of the SAC's allegations – that he would continue to purchase Dove products.  As such, Plaintiff falls into the category of past purchasers who are not likely to encounter future harm.  In sum, while Plaintiff reframes his standing argument in the SAC, he still seeks to rely on a past injury to establish a future harm.

The Court concludes that Plaintiff lacks standing to pursue the injunctive relief that he seeks in the proposed SAC.  Leave to amend will be denied as to injunctive relief because the amendment would be futile.

III.    **GBL CLAIMS**

    A.    **Applicable Law**

GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce," while GBL § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce."  N.Y. GBL §§ 349, 350.

To state a claim under either section, "'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'"  Wynn v. Topco Assocs., LLC, 2021 WL 168541, at *2 (S.D.N.Y. Jan. 19, 2021) (quoting Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015)).  To survive a motion to dismiss, "'plaintiffs must do more than plausibly allege that a label might conceivably be misunderstood by some few consumers.'"  Twohig v. Shop-Rite Supermarkets, Inc., 519 F. Supp. 3d 154, 160 (S.D.N.Y. 2021) (alteration omitted) (quoting Sarr v. BEF Foods, Inc., 2020 WL 729883, at *3 (E.D.N.Y. Feb. 13, 2020)).  Rather, they must "'plausibly allege that a significant portion of the general consuming public or of targeted customers, acting reasonably in the circumstances, could be misled.'"  Id. (quoting Sarr, 2020 WL 729883, at *3).  Finally, "'[a]lthough the question of whether a business practice or advertisement is misleading to a reasonable consumer is generally a question of fact, it is well settled that a court may determine as a matter of law that an allegedly deceptive [advertisement] would not have misled a reasonable consumer.'"  Id. (quoting Wynn v. Topco Assocs., LLC, 2021 WL 168541, at *2 (S.D.N.Y. Jan. 19, 2021)).

"When analyzing whether a label is deceptive, courts do not view the label in isolation.  Instead, '[c]ourts view each allegedly misleading statement in light of its context on the product label or advertisement as a whole.'"  Pichardo v. Only What You Need, Inc., 2020 WL 6323775, at *2 (S.D.N.Y. Oct. 27, 2020) (quoting Wurtzburger v. Kentucky Fried Chicken,

2017 WL 6416296, at *3 (S.D.N.Y. Dec. 13, 2017)).  "If a plaintiff alleges that an element of a

product's label is misleading, but another portion of the label would dispel the confusion, the

court should ask whether the misleading element is ambiguous.  If so, the clarification can defeat

the claim."  Reyes v. Crystal Farms Refrigerated Distrib. Co., 2019 WL 3409883, at *3

(E.D.N.Y. July 26, 2019) (quoting Davis v. Hain Celestial Grp., Inc., 297 F. Supp. 3d 327, 334

(E.D.N.Y. 2018)).

    **B.**   **Analysis**

    In dismissing the Amended Complaint, this Court noted that

> [i]f evidence existed that Unilever's "hypoallergenic" and "tear-free" products
> cause allergic reactions or eye damage and irritation, Plaintiffs "could have
> marshaled such evidence in the [Amended] Complaint" – but they have not.
> Rivera, 2021 WL 4392300, at *5-*7.  Plaintiffs have not alleged that the Dove
> products have caused them or their loved ones to suffer any allergic reactions or
> eye irritation and damage, nor have Plaintiffs offered test results or expert reports
> demonstrating that the concentration of the allegedly harmful ingredients in the
> Dove products – products that are widely available and were sold to "hundreds of
> thousands of consumers throughout the United States" (Am. Cmplt. (Dkt. No. 28)
> ¶ 18) – cause such harm.  "These and other avenues for learning more about the
> [p]roducts were available to Plaintiffs."  Rivera, 2021 WL 4392300, at *7.  In
> sum, information about whether the Dove products are likely to cause allergic
> reactions or eye damage to significant numbers of people "is not 'peculiarly
> within the possession and control of the defendant.'"  Id. (quoting Arista Records,
> 604 F.3d at 120).

(Dismissal Order (Dkt. No. 39) at 32)

    As discussed above, in granting leave to move to amend, this Court provided

guidance as to what allegations would be necessary to justify the filing of a Second Amended

Complaint:

> Any proposed Second Amended Complaint "will have to do some combination of
> the following:  substantiate Plaintiffs' claims that the in-use concentration of the
> potentially harmful ingredients in the [Dove] [p]roducts are sufficient to cause
> harm, demonstrate that the [Dove] [p]roducts have actually caused some of the
> harms Plaintiffs say they can cause, and/or significantly strengthen Plaintiffs'
> allegations that the information necessary to state a claim is exclusively in
> Defendant's control."  Rivera, 2021 WL 4392300, at *7.

(Id. at 39)

In the proposed SAC, Plaintiff pursues the first avenue suggested by this Court –
attempting to plead allegations demonstrating that "the in-use concentration of the potentially
harmful ingredients in the [Dove] [p]roducts [is] sufficient to cause harm" in the form of allergic
reactions.  (Id.)

As an initial matter, Plaintiff Wiggins may only bring claims based on Dove
products that he purchased:

> A plaintiff can plead injury and causation for purposes of Sections 349 and 350 in
> at least one of two ways.  First, the plaintiff can plead that she was exposed to a
> material deceptive act and relied on that misrepresented fact to her detriment. . . .
> Second and importantly, however, a plaintiff can also plead both injury and
> causation under GBL §§ 349 and 350, by alleging that the defendant's misleading
> or deceptive advertising campaign caused a price premium, that the price
> premium was charged both to those who saw and relied upon the false
> representations and those who did not, and that, as a result of the price premium,
> plaintiff was charged a price she would not otherwise have been charged but for
> the false campaign.

Fishon v. Peloton Interactive, Inc., 620 F. Supp. 3d 80, 99-100 (S.D.N.Y. 2022).  Under either
approach, plaintiff must have purchased a product to claim injury for purposes of Sections 349
and 350.

Here, Wiggins alleges in the SAC that he purchased Dove Nourishing Body Wash
and Dove Men+Care Body and Face Wash Sensitive Shield.  (SAC (Dkt. No. 43-1) ¶ 19)
Accordingly, this Court will analyze his GBL claims in connection with these two Dove
products.

As discussed above, Plaintiff's claims in the SAC are premised on allegations that
the two Dove products contain four chemicals that are allergens, irritants, or sensitizers.  The
first is niacinamide, but that chemical is not found in either Dove Nourishing Body Wash or

Dove Men+Care Body and Face Wash Sensitive Shield. Accordingly, Plaintiff's GBL claims fail to the extent they are premised on niacinamide.

As to the remaining chemicals cited in the SAC, the Court concludes that Plaintiff has still not "substantiate[d] [his] claims that the in-use concentration of [these] potentially harmful ingredients in the [Dove] [p]roducts are sufficient to cause harm." (Dismissal Order (Dkt. No. 39) at 39 (quoting Rivera, 2021 WL 4392300, at *7))

1.    **Methylisothiazolinone ("MI")**

As to methylisothiazolinone, the proposed SAC does not properly allege that this chemical is found in the two Dove products Plaintiff purchased.

While Plaintiff alleges in the SAC that Dove Men+Care Body and Face Wash Sensitive Shield contains MI (SAC (Dkt. No. 43-1) ¶¶ 49, 78), the supporting exhibits Plaintiff cites in the SAC either contradict or do not adequately support that allegation.

Exhibit 1 to the SAC includes images of the Dove product's container and its ingredients panel. MI is not listed in the ingredients panel as one of the product's ingredients. (SAC, Ex. 1 (Dkt. No. 43-3) at 6-8)

Plaintiff also provides a screenshot of what may be the product page for Dove Men+Care Body and Face Wash Sensitive Shield on a Dove website, as well as a screenshot from a "SmartLabel" website. In both screenshots, MI is listed as an ingredient in Dove Men+Care Body and Face Wash Sensitive Shield. (Id. at 9-11)

The screenshots from the websites are not sufficient to demonstrate that the Dove product actually contains MI, however. As to the SmartLabel website, there is a disclaimer stating: "Please refer to the label on your product for the most accurate ingredient information." (Id. at 10) Given the disclaimer, the absence of information suggesting that Unilever controls or determines the content of the SmartLabel website, and the fact that the product's label does not

refer to MI, the screenshot from the SmartLabel website is not adequate to demonstrate that the Dove product contains MI.

As for the screenshot of what may be a page from a Dove website, no information is provided as to when or from what website the screenshot was obtained. One of the ingredients listed in the screenshot – MI – is not found on the product label, and one of the ingredients listed on the product label – sodium benzoate – is not listed in the screenshot. (Id. at 7-9) The Court concludes that the product label is a more reliable source for the product's ingredients than the screenshot Plaintiff provides. The Court therefore concludes that the SAC does not plausibly allege that Dove Men+Care Body and Face Wash Sensitive Shield contains MI.

### 2.    **DMDM Hydantoin**

The SAC alleges that Dove Men+Care Body and Face Wash Sensitive Shield contains DMDM hydantoin in a concentration high enough to cause an allergic reaction in a significant number of individuals. (SAC (Dkt. No. 43-1) ¶¶ 94-104) According to the SAC, this chemical acts "as a preservative to protect the product from bacteria, yeast, and mold." (Id. ¶ 101 (citing SAC, Ex. 24 (Dkt. No. 43-30) at 7)) Plaintiff further alleges that "for DMDM hydantoin to perform its preservative function, it must be used at a concentration of at least 0.15%." (Id. ¶ 102 (citing SAC, Exs. 25, 26 (Dkt. Nos. 43-31, 43-32)) Finally, the SAC cites "reputable testing showing allergic responses to a 0.1% concentration of DMDM hydantoin in humans." (Id. ¶ 98 (citing SAC, Ex. 21 (Dkt. No. 43-27)) Plaintiff asserts that "[b]ecause Dove includes DMDM hydantoin in its product as a preservative, the minimum possible concentration Dove uses is greater than 0.15%[,] . . . which is more than the amount known to cause an allergic reaction in a significant number of persons." (Id. ¶¶ 103-104)

In alleging that DMDM hydantoin must be used at a concentration of at least 0.15% in order to fulfill its preservative function, the SAC cites to SAC Exhibits 25 and 26,

which are – respectively – printouts from the websites of "TroyCare" and "Akema Fine

Chemicals."  (SAC, Exs. 25, 26 (Dkt. Nos. 43-31, 43-32))

    SAC Exhibit 25 – the TroyCare exhibit – contains website pages for TroyCare

BD55, "a highly effective, water soluble antibacterial preservative. . . . specifically engineered

for use in Personal Care Products and Cosmetic formulations."  (Dkt. No. 43-31 at 2)  The

"active ingredient" in TroyCare BD55 is DMDM hydantoin.  (Id. at 2-3)  The TroyCare website

states that

> TroyCare BD55 is typically used at levels of 0.10 – 0.30% by weight in the final
> formulation. . . . Because personal care formulations vary with each manufacturer and
> these variations may impact the preservative, it is recommended that the manufacturer
> confirm the efficacy and stability of TroyCare BD55 in use. . . . Troy offers free
> preservative challenge testing and our [Troy Microbiological Management Advantage]
> program to help you determine the best preservative system and optimum use levels for
> your specific situation. . . .

(Id. at 3)

    The TroyCare website pages do not support the SAC's assertion that "the

minimum possible concentration [of DMDM hydantoin that] Dove uses [in Dove Men+Care

Body and Face Wash Sensitive Shield] is greater than 0.15%."  (SAC (Dkt. No. 43-1) ¶¶ 103-

104)  Indeed, these pages contain no representations about any Dove product or the efficacy of

DMDM hydantoin at a concentration of 0.15%.

    SAC Exhibit 26 – the Akema Fine Chemicals exhibit – contains website pages for

Akema Fine Chemicals' Kemidant K product, "a broad spectrum preservative blend based on

cosmetic ingredients with [a] long history of safe use, very effective against Gram-negative and

Gram-positive bacteria, yeasts and molds."  (SAC, Ex. 26 (Dkt. No. 43-32) at 2)  Kemidant K is

composed of DMDM hydantoin, potassium sorbate, and water.  (Id.)  The Akema website reports

that DMDM hydantoin "has been available as [a] cosmetic ingredient since 1978" and is one of

"the ten most frequently used in [the] USA." (Id. at 3)  "Kemidant K is a broad spectrum preservative blend with high antimicrobial activity and good skin/mucosa tolerability. . . ." (Id. at 11)  While the Akema website presents data concerning the "inhibitory" and biocidal" activity of Kemidant K with respect to bacteria, yeasts, and molds, the website warns that this data "shouldn't be intended as concentrations of use:  to ensure the preservation adequacy in the finished product a preservation efficacy test (Challenge test) is always recommended." (Id. at 5)

With respect to toxicological data, the Akema website reports that "[t]he components of *Kemidant K* have been safely used in cosmetics for more than 30 years, and subjected to repeated toxicological testing.  They were evaluated by the expert panel of the Cosmetic Ingredient Review (CIR) and judged safe at use levels up to 1.2%.  In this range of use it is considered not irritating and not sensitizing." (Id. at 13) (emphasis in original); see also id. ("*DMDM Hydantoin* was CIR evaluated in 1988 and judged in the Final Report on the Safety Assessment safe when incorporated in cosmetic products to the levels of 0.6%.  Several studies have been conducted in order to detect significant toxicological effects; the results of these test permit [sic] to consider DMDM Hydantoin as non irritating and non sensitizer." (emphasis in original)))  The Akema website further notes that Kemidant K "is approved as [a] cosmetic preservative in the European Union and USA to a maximum concentration of 1.2% without restrictions." (Id.)

As with the TroyCare website pages, the Akema website pages contain no representations about any Dove product or the efficacy of DMDM hydantoin at a concentration of 0.15%.  The Akema website pages do, however, directly contradict the SAC's assertion that DMDM hydantoin is a skin irritant and skin sensitizer at a concentration of 0.15%.

Because SAC Exhibits 25 and 26 do not support the SAC's assertions regarding DMDM hydantoin, the SAC's allegations regarding Defendant's use of this chemical in Dove products constitute impermissible "'naked assertions' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557). The Court concludes that the SAC does not sufficiently allege that Dove Men+Care Body and Face Wash Sensitive Shield contains DMDM hydantoin in a concentration that "cause[s] an allergic reaction in a significant number of persons." (SAC (Dkt. No. 43-1) ¶ 104)

### 3.  Cocamidopropyl Betaine ("CAPB")

The SAC alleges that Dove Nourishing Body Wash contains more than 1% CAPB – a concentration allegedly high enough to causes allergic reactions. (SAC (Dkt. No. 43-1) ¶¶ 49, 79-93) In support of this assertion, the SAC cites studies addressing what concentration of CAPB could cause an allergic response.

The SAC explains that

> [p]atch tests are commonly used to diagnose a person as being allergic to a certain substance. A small amount of an allergen is placed on a patch, which is then applied to the skin. . . . Because patch tests are used to elicit an allergic response, the concentration used in a patch test is evidence that a product using the same concentration will similarly induce an allergic response. . . . To determine if a person is allergic to CAPB, dermatologists use patch tests with a 1% concentration of CAPB. . . .

(Id. ¶¶ 80-82 (citing SAC, Exs. 16, 17 (Dkt. Nos. 43-22, 43-23))

The SAC goes on to assert that "in a study performed at the Mayo [C]linic of patch tests performed at the clinic between 2001 and 2005, 4.5% [of patients] were found to suffer an allergic reaction to CAPB at a concentration of 1%. (Id. ¶ 84 (citing SAC, Ex. 18 (Dkt. No. 43-24) at 4)

The SAC does not directly address the percentage of CAPB found in Dove Nourishing Body Wash, however. Instead, it relies on comparisons to other Dove products.

According to the SAC, Dove Nourishing Body Wash "ha[s] CAPB listed directly after water in the ingredient list, indicating that, other than water, the product contains more CAPB than any other ingredient (other than water)."  (Id. ¶ 88)  The SAC further alleges that in Dove Dry Skin Relief Gentle Cleansing Body Wash's ingredient list, CAPB is listed immediately after water.  (Id. ¶ 88 (citing SAC, Ex. 2 (Dkt. No. 43-8))  According to a published safety data sheet, Dove Dry Skin Relief Gentle Cleansing Body Wash contains CAPB in a concentration between 1-10%.  (SAC Ex. 2 (Dkt. No. 43-8) at 30)  The SAC asserts that – based on the order of ingredients – Dove's Nourishing Body Wash – like Dove Dry Skin Relief Gentle Cleansing Body Wash – must contain CAPB in a concentration between 1-10%.  (SAC (Dkt. No. 43-1) ¶ 88)

This is mere speculation.  While the order of the ingredients – water and CAPB – is the same with respect to the two Dove products, it is impossible to determine – merely from the order of ingredients – the concentration of CAPB that Dove Nourishing Body Wash contains.

In any event, courts have repeatedly rejected the comparison model that Plaintiff utilizes, albeit in a different context.  The comparison model has been addressed most frequently in "slack-fill" cases, where a plaintiff complains that a food or beverage maker has left space in a container for non-functional reasons.  In that context, the comparison model has been repeatedly rejected.  See Alce v. Wise Foods, Inc., 17 Civ. 2402 (NRB), 2018 WL 1737750, at *8 (S.D.N.Y. Mar. 27, 2018) ("Plaintiffs cite only dicta from a single case for the proposition that such comparisons are sufficient to allege nonfunctional slack-fill."); Morrison v. Barcel USA, LLC, 18 CV 531 (VB), 2019 WL 95477, at *3 (S.D.N.Y. Jan. 2, 2019) ("plaintiff fails to cite any Second Circuit authority relying on a comparison of similar products to uphold a claim for non-functional slack fill."); Daniel v. Tootsie Roll Indus., LLC, 17 Civ. 7541 (NRB), 2018 WL

3650015, at *10 (S.D.N.Y. Aug. 1, 2018) (stating that "FDA guidance is inconsistent with [the comparison approach]" (internal citation and quotations omitted)); Jackson v. Gen. Mills, Inc., 18 Civ. 2634 (LAB) (BGS), 2020 WL 5106652, at *4 (S.D. Cal. Aug. 28, 2020) (rejecting the comparison method and noting that "[o]ther courts similarly reject this comparison method of establishing that slack-fill is non-functional"); Benson v. Fannie May Confections Brands, Inc., 17 Civ. 3519, 2018 WL 6446391, at *3 (N.D. Ill. Dec. 10, 2018), aff'd, 944 F.3d 639 (7th Cir. 2019) (finding the comparison method unpersuasive, in part because "in its guidance interpreting the slack-fill statute, the FDA cautions against concluding slack-fill is nonfunctional based on comparisons to other identical products, let alone similar products packaged differently").

Even if the comparison model was appropriate to establish the concentration of CAPB in Dove Nourishing Body Wash, Plaintiff has not shown that the two Dove products being compared – Dove Nourishing Body Wash and Dove Dry Skin Relief Gentle Cleansing Body Wash – are sufficiently similar.

FDA regulations provide that,

> [a]s an alternative to listing all ingredients in descending order of predominance, ingredients may be . . . listed in the following manner and order:  (1) Ingredients, other than color additives, present at a concentration greater than 1 percent, in descending order of predominance; followed by (2) Ingredients, other than color additives, present at a concentration of not more than 1 percent, without respect to order of predominance.

21 C.F.R. § 701.3(f)(1)-(2).

Here, Plaintiff has not alleged any similarity between the two Dove products other than the order of two ingredients.  (See SAC (Dkt. No. 43-1) ¶ 88)  Moreover, Plaintiff concedes that it is possible that the amount of CAPB in Dove Nourishing Body Wash "is less than 1%, since federal regulations allow [Defendant] to list ingredients at concentrations under 1% in any order."  (Pltf. Br. (Dkt. No. 44) at 12)

The Court concludes that the SAC does not plausibly allege that either of the two Dove products Plaintiff purchased "contain skin allergens in an amount that is known to cause an allergic reaction in a significant number of people."  (SAC (Dkt. No. 43-1) ¶ 53)  Accordingly, Plaintiff's motion to amend his GBL claims will be denied.

## IV.    <u>BREACH OF EXPRESS WARRANTY</u>

"[I]n order to assert a breach of express warranty claim under New York law, 'a buyer must provide the seller with timely notice of the alleged breach of warranty.'"  <u>Lugones v. Pete & Gerry's Organic, LLC</u>, 440 F. Supp. 3d 226, 244 (S.D.N.Y. 2020) (quoting <u>Quinn v. Walgreen Co.</u>, 958 F. Supp. 2d 533, 544 (S.D.N.Y. 2013)); <u>see also</u> N.Y. U.C.C. § 2-607(3)(a) ("[T]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.").

In granting Defendant's motion to dismiss the breach of express warranty claim in the Amended Complaint, this Court noted that Plaintiff Wiggins had not pled when he purchased the Dove products at issue, or when he discovered the alleged defect in these products.  As a result, the Amended Complaint's allegations did not demonstrate that Wiggins gave notice to Defendant within a reasonable time after he discovered the alleged breach of warranty. (Dismissal Order (Dkt. No. 39) at 32-36)

In the proposed SAC, Plaintiff alleges that in "[l]ate December 2020, [he] learned that Dove's products were not hypoallergenic."  (SAC (Dkt. No. 43-1) ¶ 22)  "Within eight months, on August 18, 2021, Plaintiff provided Dove and the retailers from which he purchased the Falsely Labeled Products notice of the breach of warranty by certified mail, return receipt requested."  (<u>Id.</u>)  Plaintiff further contends that, "[b]y claiming breach of express warranty in his original complaint, he also provided notice five months earlier, on March 5, 2021."  (Pltf. Br. (Dkt. No. 44) at 6)

Defendant counters that notice must be "pre-litigation," and that the filing of a complaint should not be deemed sufficient in a case that does not involve physical injury.  (Def. Br. (Dkt. No. 45) at 10-12)

In the Dismissal Order, this Court noted that "[m]ost courts in this District have concluded that the filing of a complaint does not constitute adequate notice of a breach of warranty claim."  (Dismissal Order (Dkt. No. 39) at 33)

In Lugones, 440 F. Supp. 3d at 244-45, the court rejected plaintiff's argument that the filing of a complaint constitutes adequate and timely notice:

> [In arguing that a complaint constitutes adequate and timely notice], Plaintiffs cite to a single case, Panda Capital Corp. v. Kopo Int'l, Inc., 242 A.D.2d 690[, 662 N.Y.S.2d 584] (2d Dep't 1997) . . . All that the Panda Capital court found was that where the plaintiff had both filed a complaint and an amended complaint and "had repeatedly made its objections to [defendant's] pattern of deficient performance known[,] . . . it [was] at the very least an issue of fact as to whether reasonably timely notice of breach was given."  See 662 N.Y.S.2d at 586-87.  The Court does not believe that such an equivocal statement amounts to a binding rule that Plaintiffs' filed complaint, regardless of its temporal distance from the alleged breach of the warranty, satisfies N.Y. U.C.C. § 2-607(3)(a).  This belief is supported by the Court's inability to locate any authority, from either a New York State court or from within this Circuit, that relies on Panda Capital for such a broad rule.  Indeed, Mid Island LP v. Hess Corp., 983 N.Y.S.2d 204 (Table), 2013 WL 6421281 (Sup. Ct. Dec. 2, 2013), a New York state court case that cites to Panda Capital, see id. at *4, makes clear that "timely notice is a condition precedent to bringing an action for breach of warranty,"id. (emphasis added).

Lugones, 440 F. Supp. 3d at 244-45 (citations omitted); see also, e.g., Barton v. Pret A Manger (USA) Ltd., 535 F. Supp. 3d 225, 246 (S.D.N.Y. 2021) ("The holding of Lugones is consistent with the view of a leading commentator on the Uniform Commercial Code.") (collecting cases following Lugones); Clemmons v. Upfield US Inc., 667 F. Supp. 3d 5, 21 (S.D.N.Y. 2023) ("Giving due deference to Panda Capital but noting that the plaintiff there had assertedly made its objections known pre-suit, the Court agrees with the majority of district courts that have addressed this issue."); Dwyer v. Allbirds, Inc., 598 F. Supp. 3d 137, 155 (S.D.N.Y. 2022)

("Although Plaintiff argues that its pleadings may constitute reasonable notice in certain cases,

. . . this is a minority view, not 'a broad rule that a filed complaint qualifies as sufficient and

timely notice.'" (quoting <u>Lugones</u>, 440 F. Supp. 3d at 244)).

  While citing the majority rule in the Dismissal Order, this Court acknowledged

that

> [a] distinct minority of courts have ruled that the issue of whether the filing of a
> complaint provides adequate notice presents a fact question for the jury. <u>See</u>
> <u>Tomasino</u>, 44 F. Supp. 3d at 262 n.6 ("New York cases applying N.Y. U.C.C. § 2-
> 607(3) suggest that a plaintiff's pleadings may constitute reasonable notice in
> certain cases.") (citing <u>Panda Capital</u>, 242 A.D.2d 690, 662 N.Y.S.2d 584);
> <u>Patellos v. Hello Prod., LLC</u>, 523 F. Supp. 3d 523, 534 (S.D.N.Y. 2021) ("[A]
> district court in this Circuit has upheld this form of notice.") (citing <u>Tomasino</u>, 44
> F. Supp. 3d at 262 n.6).

(Dismissal Order (Dkt. No. 39) at 34)

  In the Dismissal Order, this Court did not resolve the issue posed by the

conflicting authority, because Plaintiff "ha[d] not properly alleged that whatever notice he

provided was within a 'reasonable time after' he discovered the alleged breach of warranty." (<u>Id.</u>

(quoting NY. U.C.C. Law § 2-607(3)(a)))

  In light of the SAC's new allegations concerning this point, this Court resolves

the issue, and joins the majority of courts in holding that (1) notice must be provided pre-

litigation; and (2) the filing of a complaint does not constitute adequate notice of a breach of

warranty claim.

  Because Plaintiff did not provide pre-litigation notice to Defendant of the alleged

breach of warranty, his breach of express warranty claim fails, and the motion to amend that

claim will be denied.

## <u>CONCLUSION</u>

For the reasons stated above, Plaintiff's motion for leave to file the Second

Amended Complaint (Dkt. No. 43) is denied.  The Clerk of Court is directed to terminate the

motion, to enter judgment for Defendant, and to close this case.

Dated:  New York, New York
        March 31, 2024

                                   SO ORDERED.

                                   Paul G. Gardephe
                                   United States District Judge